UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
ERNE SHIPPING INC.,                                  :

                              Plaintiff,             :        05 Civ. 8915 (GWG)

        -v.-                                         :        <u>OPINION AND ORDER</u>

HBC HAMBURG BULK CARRIERS                            :
GMBH & CO. KG,
                                                     :
                              Defendant.
----------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**


APPEARANCES OF COUNSEL:

Charles E. Murphy, Tisdale & Lennon, LLC, New York, NY, for plaintiff.

Michael E. Unger, Lawrence J. Kahn, Freehill Hogan & Mahar, LLP, New York, NY, for
defendant.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ERNE SHIPPING INC.,                                    :

                        Plaintiff,                     :        05 Civ. 8915 (GWG)

        -v.-                                           :        <u>OPINION AND ORDER</u>

HBC HAMBURG BULK CARRIERS                               :
GMBH & CO. KG,
                                                       :
                        Defendant.
-------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

On October 20, 2005, plaintiff Erne Shipping Inc. ("Erne") was granted an <u>ex parte</u> order

attaching assets of defendant HBC Hamburg Bulk Carriers GMBH & Co. KG ("HBC").  <u>See</u> Ex

Parte Order for Process of Maritime Attachment, dated October 20, 2005 (Docket #4).  HBC now

moves to vacate the attachment.  The parties have consented to jurisdiction over this matter by a

United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  For the reasons stated below,

HBC's motion to vacate is denied.

I. <u>BACKGROUND</u>

    A. <u>Procedural History</u>

Erne and HBC are currently participating in an arbitration in London involving Erne's

claim that HBC breached two maritime contracts in 2003 and 2004.  Erne is a shipping company

based in Monrovia, Liberia.  HBC is a shipping company based in Hamburg, Germany.  Erne

claims damages in the arbitration of $188,647.79, inclusive of fees, costs, and interest.

    Relying on Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims

("Rule B"), Erne sought and obtained an order of attachment for this amount pending the

outcome of the arbitration.  See Verified Complaint, dated October 19, 2005 (Docket #1) ("Compl."), ¶¶ 8, 11, 12, 14; Affidavit in Support of Prayer for Maritime Attachment, dated October 20, 2005 (Docket #3) ("Aff. in Support").  Following expedited briefing by the parties, a hearing was held on November 4, 2005, pursuant to Rule E(4)(f), at which Erne was required to show cause why the order of attachment should not be vacated.  See Defendant's Memorandum of Law in Support of Motion to Vacate the Attachment, dated October 31, 2005 (Docket #14) ("Def. Mem."); Plaintiff's Memorandum of Law in Opposition to Motion to Vacate the Attachment, dated Nov. 3, 2005 (Docket #6); Defendant's Reply Memorandum of Law in Further Support of Its Motion to Vacate the Attachment, dated Nov. 4, 2005 (Docket #9).  At the request of the Court, the parties submitted additional briefing after the hearing.  See Defendant's Post-Hearing Memorandum of Law in Further Support of Its Motion to Vacate the Attachment, dated Nov. 16, 2005 (Docket #15); Plaintiff's Reply Memorandum of Law in Opposition to Motion to Vacate Attachment, dated Nov. 16, 2005 (Docket #17) ("Pl. Post-Hearing Mem.").  HBC argues that it is entitled to vacatur because it can be "found" in this district within the meaning of Rule B.

B.  Factual Background

1.  Nature and History of HBC

HBC's primary business is "the chartering (leasing) of ships from vessel owners for a set period of time and subsequent sub-chartering of those ships to other companies to carry cargo either on a single voyage basis for which HBC collects freight or on a time basis for which HBC collects hire."  See Third Declaration of Thomas Boggild, dated November 15, 2005 (Docket #16) ("Third Boggild Decl."), ¶ 3.

HBC was incorporated in Germany in 1999, and was converted to a German limited partnership in 2001.  <u>See</u> Declaration of Thomas Boggild, dated October 28, 2005 (Docket #13) ("Boggild Decl."), ¶ 3.  It has fifteen employees including directors.  All of these employees are based in Hamburg.  <u>See</u> Deposition of Thomas Boggild, dated November 10, 2005 (reproduced as Ex. 1 to Pl. Post-Hearing Mem.), at 8.  HBC's website indicates that the company is located solely in Hamburg.  <u>See id.</u> at 16-17.

HBC is a "substantial" company with a "strong and solid" industry reputation.  <u>See</u> Boggild Decl. ¶ 4.  In its capacity as a provider of ships for bulk cargoes and as a commercial ship management company for third parties, it has chartered more than 400 vessels between 2000 and 2005, and conducted more than 695 voyages, of which 134 were related to the United States. <u>Id.</u> ¶¶ 5, 6.  It has also operated "numerous" vessels as "commercial managers" for other shipowners.  <u>Id.</u> ¶ 6.  HBC earned revenues of "approximately $406 million in gross in the years 2000-2004."  <u>Id.</u> ¶ 7.  Of this figure, approximately $69.5 million was earned as the result of doing business with "shippers, receivers, and charterers" in the United States.  <u>Id.</u>  As of June 2005, HBC had earned gross revenues of approximately $482 million, $73 million of which was earned as a result of doing business with United States-based shippers, receivers, and charterers. <u>Id.</u>

## 2. Business "Registration" in New York

In August 2005, HBC "register[ed]" with the New York State Department of State's Division of Corporations "so as to create a formal presence within the United States in New York City," which it determined would "also help to serve HBC's growing connections with cargo shippers located elsewhere throughout the United States."  Boggild Decl. ¶¶ 21-22.  HBC "is

comfortable with the fact that its registration in New York makes it liable to answer any suit brought by any party in any New York Court for any amount of damages." Id. ¶ 23.  HBC has also appointed Michael Unger, its attorney in New York, as its agent to accept service of process here.  See id. ¶ 24.

### 3.  Contracts with New York-based Companies

HBC has pointed to two main types of contracts that it has with New York-based companies.  First, it states that it has "fixed" – that is, contracted to charter, see T. 29 – 16 vessels with shipbrokers in New York State in the last five years.  See Boggild Decl. ¶ 9.[1]  These shipbrokers earn a commission based on a percentage of the daily hire rate or freight charges paid to HBC by the shippers or charterers.  See Third Boggild Decl. ¶ 4.

Second, between 2000 and the present, HBC has entered into 14 contracts with three different New York-based shippers (or charterers) to carry cargoes.  See Boggild Decl. ¶ 10; T. 36.  It has provided copies of the 14 "charter parties" (i.e., contracts) with these shippers.  See Ex. A to Boggild Decl.

Between 2000 and 2004, HBC earned gross revenues of approximately $8.79 million from shipments undertaken on behalf of New York-based companies.  See Boggild Decl. ¶ 15.

HBC has also pointed to two additional contracts it has made with New York companies.  HBC was party to a "Forward Freight 'Swap' Agreement" with Fairfield Bulk Carriers Inc., an agreement that had been negotiated by a company located in Harrison, New York.  See Third Boggild Decl. ¶ 11.  The agreement, which covered the first half of 2005, was "essentially a derivatives contract whereby HBC attempts to insulate itself from market fluctuations in freight

---

[1]"T." refers to the transcript of the hearing held November 4, 2005.

rates for future shipments during the covered period." Id. ¶ 11.

Since 2003, HBC has also contracted with Fleetweather, which is based in Hopewell Junction, New York, to provide weather routing information for more than 80% of HBC-operated vessels. HBC has "almost daily contact" with Fleetweather, and occasionally retains its services to conduct "post-voyage analysis" in the event of a weather-related dispute. HBC pays Fleetweather approximately $32,000 per year for these services. See Boggild Decl. ¶ 16.

### 4. Vessels in New York Waters

HBC states that three vessels it has "time chartered" have called at the Port of New York to unload cargo. See Third Boggild Decl. ¶ 8. Erne notes that it was the customer's decision as to where these boats called. See Pl. Post-Hearing Mem. at 6. HBC states in response that it was "well aware that the customer intended the cargo to be carried to New York," and "had the option of not entering into the contract with the customers." See Third Boggild Decl. ¶ 8.

### 5. Other Contacts

HBC alleges that it markets its services to New York-based cargo shippers. See Boggild Decl. ¶ 14. Specifically, in December 2003, one of HBC's partners, Georg Greilinger, met with "various current and potential customers" in New York. Id. In addition, at a maritime convention in Stamford, Connecticut, Mr. Greilinger also met with other New York-based companies with which HBC does business or to which it has marketed its services. See id. HBC has also marketed itself to New York companies at various international shipping meetings and trade fairs around the world. At these meetings, HBC solicits business from, among others, New York-based brokers, vessel owners, and shippers. HBC "hopes to continue to do business with those companies with whom it has already formed a business relationship, and to have an

opportunity to do business with other companies whom it meets through these contacts." See Third Boggild Decl. ¶ 12.

In two of its charter parties, HBC has agreed to arbitrate any disputes in New York. See Boggild Decl. ¶ 12, Ex. B.

### 6. HBC's Plans for a New York Office

With respect to HBC's intention to establish a physical office in New York in the future, HBC states it has "generally reviewed newspapers and other materials in order to get an idea of the likely cost of such an office," and it "remains committed to establishing a New York office for the purpose of expanding its relationships with New York and other U.S. companies." Third Boggild Decl. ¶ 14. HBC states it is "generally aware of the tax implications [of establishing a New York office] and is currently investigating which New York accounting firm it will hire to handle HBC's accounting needs." Id. ¶ 15. HBC has not retained immigration attorneys because it "intends to hire a U.S. citizen who is familiar with the New York and surrounding market." Id. ¶ 16.

## II. DISCUSSION

### A. Rule B Attachment

Rule B(1)(a) provides:

> If a defendant is not found within the district, a verified complaint may contain a prayer for process to attach the defendant's tangible or intangible personal property – up to the amount sued for – in the hands of garnishees named in the process.

If the plaintiff's filings show that "the conditions of this Rule B appear to exist," a district court must enter an ex parte order "authorizing process of attachment and garnishment." Rule B(1)(b).

The plaintiff need make "only [a] very modest showing" in order to secure attachment. See, e.g., Aqua Stoli Shipping Ltd. v. Gardner Smith Pty. Ltd., 384 F. Supp. 2d 726, 727 (S.D.N.Y. 2005). Once an attachment has been granted, however, the defendant is "entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated." Rule E(4)(f). At that hearing, "the party that has obtained the attachment bears the burden of showing its validity." Bay Casino, LLC v. M/V Royal Empress, 20 F. Supp. 2d 440, 451 (E.D.N.Y. 1998). There are two rationales for a Rule B attachment: it provides security for the plaintiff if a suit against the defendant is successful and it assures the defendant's appearance in an action. Winter Storm Shipping, Ltd. v. TPI, 310 F.3d 263, 268 (2d Cir. 2002), cert. denied, 539 U.S. 927 (2003).

One of the required elements for an order of attachment is that the defendant cannot be "found within the district." See Rule B(1)(a), (b). The Rule does not define the phrase "found within the district" – a choice that was made consciously by the Rule's drafters. See Advisory Committee Notes to Rule B (1966 Adoption) ("The rules have never defined the clause, 'if the defendant shall not be found within the district,' and no definition is attempted here. The subject seems one best left for the time being to development on a case-by-case basis."). The Second Circuit has held that this requirement presents "a two-pronged inquiry: First, whether (the respondent) can be found within the district in terms of jurisdiction, and second, if so, whether it can be found for service of process." Seawind Compania, S. A. v. Crescent Line, Inc., 320 F.2d 580, 582 (2d Cir. 1963) (citations and internal quotes omitted).[2] The service of process prong is

_____

[2]In a letter to the Court dated December 1, 2005, Erne cites to a three-pronged test set out in Andros Compania Maritima, S.A. v. Andre & Cie., S.A., 430 F. Supp. 88, 95 (S.D.N.Y. 1977). Andros, however, cites only to language in an edition of Moore's Federal Practice that is no

not at issue since HBC has an authorized agent to accept process within the district. Accordingly, the question presented is whether HBC is "found within this district" solely in terms of jurisdiction.

B. Jurisdictional Analysis

As an initial matter, we must decide what law is to be used for assessing HBC's presence. Most case law reflects that satisfaction of the jurisdictional prong of the Rule B analysis turns on whether the defendant has "minimum contacts" with the forum state as required by the Due Process Clause — not whether the forum state's jurisdictional statute would permit suit against the defendant. Thus, the Second Circuit has stated in dictum that the test for being "found" in a district under Rule B is whether the defendant has "'sufficient contacts with the district to meet minimum due process standards.'" Winter Storm, 310 F.3d at 268 (quoting Robert M. Jarvis, An Introduction to Maritime Attachment Practice Under Rule B, 20 J. Mar. L. & Com., No. 4 (Oct. 1989), at 521); accord Federazione Italiana Dei Consorzi Agrari v. Mandask Compania De Vapores, S.A., 158 F. Supp. 107, 109 (S.D.N.Y. 1957) ("A foreign corporation can be said to be present and doing business within the jurisdiction when its activities within this district are sufficient to make it not unfair or unreasonable to require it to respond to suit in this forum.") (citations omitted); see also United States v. Cia. Naviera Continental S.A., 178 F. Supp. 561, 563 & n.5 (S.D.N.Y. 1959) (citing to cases arising under the Due Process Clause in analyzing the "found" requirement).

---

longer utilized by Moore's itself. See James William Moore, 29 Moore's Federal Practice (3d Ed. 2005), § 705.04[2][b], at 705-64. Thus, we follow Seawind's formulation.

On the other hand, we could look to whether New York State's jurisdictional law would permit a finding of general jurisdiction over HBC. Such an inquiry would be consistent with <u>Seawind</u>'s formulation requiring that "the respondent be engaged in sufficient activity in the district to subject it to jurisdiction," 320 F.2d at 583, and with the broader principle that "the law of the forum state . . . governs the issue of personal jurisdiction in admiralty cases" generally. <u>Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria</u>, 937 F.2d 44, 50 (2d Cir. 1991). At least one district court case has looked to New York's state long-arm jurisdiction statute to determine if the "found" requirement of Rule B had been met. <u>See</u> <u>Integrated Container Service, Inc. v. Starlines Container Shipping, Ltd.</u>, 476 F. Supp. 119, 123 (S.D.N.Y. 1979). In such an inquiry, we would examine whether general jurisdiction could be found over HBC based on New York Civil Practice Law and Rules ("C.P.L.R.") § 301 and the New York case law interpreting it. <u>See</u>, <u>e.g.</u>, <u>Landoil Resources Corp. v. Alexander & Alexander Servs., Inc.</u>, 77 N.Y.2d 28, 33 (1990) (foreign corporation is amenable to suit in New York courts under section 301 "if it has engaged in such a continuous and systematic course of 'doing business' here that a finding of its 'presence' in this jurisdiction is warranted").

As it turns out, it makes no difference which standard we use because, as the Second Circuit has stated, New York State's "'doing business' standard is practically equivalent to the most permissible one that the Constitution will allow." <u>Beja v. Jahangiri</u>, 453 F.2d 959, 961 (2d Cir. 1971). With respect to the Due Process analysis, a defendant "without meaningful ties to the forum state" will not be subjected to "binding judgments within its jurisdiction." <u>Metro. Life Ins. v. Robertson-Ceco Corp.</u>, 84 F.3d 560, 567 (2d Cir. 1996). Thus, a state may assert "general

jurisdiction" – that is, jurisdiction that does not arise out of the particular claim sued upon –
where the defendant's contacts with the forum state are "continuous and systematic."
Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 415-16 (1984); accord Bank
Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 305 F.3d 120, 127 (2d Cir. 2002); U.S.
Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd., 241 F.3d 135, 152 (2d Cir. 2001).  This
test is more onerous than that required for an assertion of "specific jurisdiction" – that is,
jurisdiction over a claim arising out the very contacts at issue.  See, e.g., Metro. Life Ins., 84 F.3d
at 567.

    With respect to New York law, it too uses the "continuous and systematic" formulation to
determine whether a corporation is present for purposes of general jurisdiction.  Thus, "[s]ection
301, as construed by the New York courts, permits a court to exercise jurisdiction over a foreign
corporation on any cause of action if the defendant is 'engaged in such a continuous and
systematic course of "doing business" here as to warrant a finding of "presence" in this
jurisdiction.'" McGowan v. Smith, 52 N.Y.2d 268, 272 (1981) (quoting Simonson v. Int'l Bank,
14 N.Y.2d 281, 285 (1964)).  Under this formulation, the defendant must operate within the state
"'not occasionally or casually, but with a fair measure of permanence and continuity.'"  Laufer v.
Ostrow, 55 N.Y.2d 305, 310 (1982) (quoting Tauza v. Susquehanna Coal Corp., 220 N.Y. 259,
267 (1917)).

    Here, there is nothing "continuous and systematic" in HBC's contacts with the State of
New York.  In assessing whether a corporation's contacts are "continuous and systematic" under
New York law, courts have typically focused on factors such as: "whether the company has an
office in the state, whether it has any bank accounts or other property in the state, whether it has a

phone listing in the state, whether it does public relations work there, and whether it has individuals permanently located in the state to promote its interests." Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 98 (2d Cir. 2000) (citing Hoffritz for Cutlery, Inc. v. Amajac, Ltd., 763 F.2d 55, 58 (2d Cir. 1985); Frummer v. Hilton Hotels Intern., Inc., 19 N.Y.2d 533, 537 (1967)).

None of these factors is present here. HBC has no office in the state. It has no property in the state. It has no phone listing or employees located in the state. It does no advertising in the state. It has caused an employee to come to New York State to solicit business exactly once. Essentially, all it has done is enter into a few contractual arrangements each year during the past five years that involve, in part, New York companies. These contracts, although not insignificant in amount, represent a tiny fraction (approximately 2%) of HBC's overall revenue. While some of these contracts have caused vessels to dock within New York State's jurisdiction, these visits have no great jurisdictional significance beyond the revenue that is generated to New York from the underlying contracts. See generally Fremay, Inc. v. Modern Plastic Machinery Corp., 15 A.D.2d 235, 241 (1st Dep't 1961) ("[t]he mere solicitation of business or the shipment of goods from without the State to [New York State] buyers on contracts made elsewhere" is insufficient for jurisdictional purposes). Even the contracts with New York-based shippers must be considered in light of the fact that they all involved shipments to other locations. See generally Crouch v. Atlas Van Lines, Inc., 834 F. Supp. 596, 600 (N.D.N.Y. 1993) (noting for purposes of jurisdictional analysis that revenues to interstate trucking company from New York shipments necessarily involved other states). Only one contract, involving HBC's subscription to receive weather information, is ongoing. HBC's entry into two contracts in the past that contained

agreements to arbitrate in New York is of little significance, as are its plans to someday open an office in New York.

Taken together, these contacts fall far short of the "continuous and systematic" activity required either by New York law or by the Due Process Clause to subject a foreign defendant to suit on a cause of action unrelated to its contacts. Obviously, this is not a case where HBC "solicits business in New York systematically" – for example, by means of an agent or regular advertisements or mailings. Bicicletas Windsor, S.A. v. Bicycle Corp. of America, 783 F. Supp. 781, 784 (S.D.N.Y. 1992) (emphasis and citation omitted). In any event, "mere solicitation" in New York by a seller of goods or supplier of services does not constitute doing business here; rather, there must be "activities of substance in addition to solicitation." Laufer, 55 N.Y.2d at 310; see also Daniel v. American Bd. of Emergency Medicine, 988 F. Supp. 127, 219 (W.D.N.Y. 1997) ("courts have generally refused to find jurisdiction under the solicitation plus doctrine when revenues derived from solicitation in New York state comprise an insubstantial percentage of a defendant's total sales") (citing cases); Stark Carpet Corp. v. M-Geough Robinson, Inc., 481 F. Supp. 499, 505 (S.D.N.Y. 1980) (no jurisdiction where defendant derived 2% of its total income from business in New York, visited New York four times per year, and did not carry on its solicitation from a "permanent locale" within the state); Patrician Equity Corp. v. Meadows, 1987 WL 4910, at *3 (S.D.N.Y. Apr. 28, 1987) (2% of total sales to New York customers did not render defendant's activities permanent); New England Laminates Co., Inc. v. Murphy, 79 Misc. 2d 1025, 1027 (N.Y. Sup. Ct. 1974) (no jurisdiction over foreign corporation that advertised in New York, shipped goods to New York buyers, and maintained two employees in New York). Because HBC's activities are "all sporadic and not carried out from a permanent location in the

State or by its agents or employees in the State . . . [they] 'do not amount to a continuous and systematic course of conduct within the State required by CPLR 301 to justify the assertion of jurisdiction over . . . defendant.'" Cardone v. Jiminy Peak Inc., 245 A.D.2d 1002, 1004 (3d Dep't 1997) (citation omitted). To give but one example arising under the Due Process Clause, in Milne v. Catuogno Court Reporting Services, Inc., 239 F. Supp. 2d 195 (D. Conn. 2002), even though the foreign defendant solicited business and provided services to "many law firms" in the forum state, maintained a telephone number in the state, and rented office space there, these contacts were deemed not "of the 'continuous and systematic' nature necessary to confer" general jurisdiction. Id. at 204.

      C.  Authorization To Do Business Under the New York Business Corporation Law

      HBC has one additional contact that has not formed part of our analysis up until now: its authorization to do business in New York. New York's Business Corporation Law ("B.C.L.") provides that a foreign corporation "shall not do business in [New York] state until it has been authorized to do so." B.C.L. § 1301. A foreign corporation that wishes to do business must submit an application to the New York State Department of State, id. § 1304, whereupon the corporation receives authority to do business upon the filing of that application by the Secretary of State. Id. § 1305. The law also requires the entity to designate the Secretary of State as an agent for service of process and to list any other registered agent for service of process. Id. § 1304(a)(6), (7); see also B.C.L. § 304(b) ("No . . . foreign corporation may be . . . authorized to do business in this state under this chapter unless in its certificate of incorporation or application for authority it designates the secretary of state as such agent."). While any corporation that "does business" within the state must make the required filing, the statute lists a number of

activities – such as holding meetings or maintaining bank accounts – that are insufficient to constitute "doing business" and thus that do not require filing. Id. § 1301(b). The activities that mandate a corporation to file for authorization to do business are significant. Indeed, some case law suggests that the "doing business" threshold under the Business Corporation Law is even higher than what is required for jurisdictional purposes. See Librairie Hachette, S. A. v. Paris Book Center, Inc., 62 Misc. 2d 873, 874-75 (N.Y. Sup. Ct. 1970) (citing Int'l Text-Book Co. v. Tone, 220 N.Y. 313 (1917)) ("[w]hile a foreign corporation may be considered as present within the State for the purpose of obtaining jurisdiction over it, such a determination does not necessarily carry the conclusion that the corporation is 'doing business' within the State to the extent of requiring compliance with section 1312 of the Business Corporation Law.").[3]

HBC argues that its choice to file for authorization to do business under this statute in August 2005 is sufficient by itself to permit a finding that it is found within this District. See, e.g., Def. Mem. at 10-11. As HBC notes, there is ample New York case law stating that such filing is sufficient to subject a foreign corporation to general jurisdiction for any cause of action in New York State. See, e.g., Augsbury Corp. v. Petrokey Corp., 97 A.D.2d 173, 176 (3d Dep't 1983); Robfogel Mill-Andrews Corp. v. Cupples Co., Mfrs., 67 Misc. 2d 623, 624-25 (N.Y. Sup. Ct. 1971); accord V. Alexander, Practice Commentary 301:6 (McKinney's 2002). Cases arising in the federal courts have noted the applicability of this doctrine as well. See, e.g., Iyalla v. TRT Holdings, Inc., 2005 WL 1765707, at *3 (S.D.N.Y. July 25, 2005); Cannon v. Newmar Corp., 210 F. Supp. 2d 461, 463 n.2 (S.D.N.Y. 2002); Ugalde v. Dyncorp, Inc., 2000 WL 217502, at *2

---

[3]Librairie Hachette cites to B.C.L. § 1312 because the case involved a foreign plaintiff and section 1312 provides that a foreign corporation doing business in New York cannot maintain a lawsuit until it files for authorization to do business.

(S.D.N.Y. Feb. 23, 2000); <u>Speed v. Pelican Resort N.V.</u>, 1992 WL 147646, at *1 (S.D.N.Y. June 16, 1992) (citing cases).  Two federal courts, however, have stated that in the absence of any actual business conducted in the state, a filing for authorization to do business is not by itself sufficient to confer personal jurisdiction.  See <u>Wright v. Maersk Line, Ltd.</u>, 2000 WL 744370, at *1 (S.D.N.Y. June 9, 2000); <u>Bellepointe, Inc. v. Kohl's Dep't Stores, Inc.</u>, 975 F. Supp. 562, 564 (S.D.N.Y. 1997).[4]

We need not decide which cases are correct, however, because we are prepared to accept the holdings of the New York cases on this topic, which are more favorable to HBC.  HBC's position is a simple one: a New York court would find it was subject to personal jurisdiction based merely on its filing for authorization to do business.  Therefore, it argues, it should be "found" within the Southern District of New York for purposes of Rule B attachment.  See Def. Mem. at 9-11.

Certainly, there is a surface appeal to the argument.  After all, if a New York court would find that HBC is subject to personal jurisdiction on any cause of action in New York based merely on its filing under section 1305, it might be said that it was found within the district "in terms of jurisdiction."  <u>Seawind</u>, 320 F.2d at 582.  The problem with the argument, however, is that the filing does not mean that the corporation is actually doing business of any kind in New York.  Rather, the filing merely authorizes the corporation to do business in the future.  Indeed,

---

[4]We might have reason to question the statements made by these courts on this point.  First, the only case cited in support of these statements is <u>Beja</u>, 453 F.2d at 961-62.  <u>Beja</u>'s statement on this point was in <u>dictum</u> and is phrased in only vague terms: "the mere authorization to do business . . . <u>may</u> not be conclusive on the issue of [in personam] jurisdiction."  453 F.2d at 962 (emphasis added and internal citations omitted).  In any event, <u>Beja</u> noted that even if authorization were not conclusive, it was "certainly very strong evidence that the corporation is subject to in personam jurisdiction."  <u>Id.</u> (emphasis omitted).

the law contemplates that the filing will take place <u>before</u> the corporation actually "does business."  Thus, it is entirely possible to file for authorization to do business under the Business Corporation Law  without having any contacts with New York whatsoever.  Because a company may file for authorization even if it is not "doing business" in New York and is not "present" in any real sense – as is the case here – a filing in such circumstances operates merely as a consent to be sued.

Since we have determined that HBC does not have sufficient contacts to subject it to general jurisdiction, the next question we ask is whether HBC's filing – that is, what amounts to its consent to be sued – is enough for it to be "found within the district" for purposes of Rule B. We might conclude that the filing is enough for HBC to be "found" since case law speaks broadly of inquiring into "whether (the respondent) can be found within the district in terms of jurisdiction," <u>Seawind</u>, 320 F.2d at 582, and the filing is sufficient to subject HBC to New York's jurisdiction.  On the other hand, case law also recognizes that this question is normally measured by whether the defendant is "engaged in <u>sufficient activity</u> in the district to subject it to jurisdiction."  <u>Id.</u> at 583 (emphasis added).  Under this formulation, a mere consent to be sued without actual presence could not be considered "sufficient activity" within the district.  <u>See generally</u> <u>Federazione Italiana Dei Consorzi Agrari</u>, 158 F. Supp. at 109 (corporation is "found" within the district only if it is "present in the district by its officers and agents carrying on the business of the corporation").

We would at this point normally look to the policies that underlie the maritime attachment rule to see if they provide assistance in resolving this issue.  Those policies must be approached with caution, however, since they rest on a good degree of arbitrariness.  As then-

District Judge Leval recognized in discussing the two prongs of the "found in the district" test (in personam jurisdiction and an agent for service of process):

> This test amounts to a somewhat arbitrary compromise which assumes that the plaintiff will not require the protection of an attachment for security, nor should the defendant be subjected to it, if the defendant is present in both senses, and assumes on the other hand that the plaintiff's interests are not adequately protected despite the ability to perfect In personam jurisdiction if the defendant is not present in both senses.

Integrated Container Service, Inc., 476 F. Supp. at 122.

While this Court concurs in Judge Leval's description of the arbitrariness of the rule, we do not feel bound to ignore the rules's underlying purposes in determining whether filing under section 1305 is sufficient to meet the in personam jurisdiction prong. Nor does Judge Leval imply that it is necessary to do so. The maritime attachment rule is grounded in at least some logic and thus it is appropriate to try to vindicate its underlying policies in instances where precedent provides no guidance. We are supported in this endeavor by recent case law concluding that "it is not reasonable for [an order of attachment] to remain in effect where it is not necessary to effectuate either of Supplemental Rule B's purposes." Seaplus Line Co. Ltd. v. Bulkhandling Handymax AS, 2005 WL 3455816, at *2 (S.D.N.Y. Dec. 13, 2005); accord Aqua Stoli, 384 F. Supp. 2d at 729 (on motion to vacate attachment, "plaintiff must show . . . that the attachment order not only meets all technical requirements but also is reasonably calculated to serve at least one of the two historical purposes of obtaining jurisdiction or securing a judgment and is not simply a tactical device designed to harass the adversary in an ongoing litigation"). Conversely, it would not be reasonable to interpret the "found in the district" requirement to

require vacatur of an order of attachment in circumstances where that vacatur would not serve Rule B's purposes.

As noted, the purposes of the maritime attachment rule are (1) to provide security for the plaintiff if a suit is successful, and (2) to assure the defendant's appearance in an action. <u>Winter Storm</u>, 310 F.3d at 268. Accordingly, to determine how to treat a filing for authorization to do business under section 1305, we ask whether treating such a filing alone as meeting the "found within the district" requirement would vindicate these two policies. We believe that it would not.

First, a mere filing for authorization to do business provides no security to a plaintiff. While we recognize that a rule requiring actual presence in the district (rather than just consent) also does not necessarily provide security, at least actual presence makes it far more likely that assets might be located in the district to levy upon should the suit be successful. A voluntary filing under the Business Corporation Law, by contrast, has little or no correlation with the presence of assets. Second, with respect to assuring the defendant's appearance in the action, the mere act of filing provides no assurance that suit could be instituted in the future since the authorization can be surrendered unilaterally at any time. <u>See</u> B.C.L. § 1310. Thus if we granted vacatur and if HBC thereupon withdrew its filing, Erne would have no means of obtaining jurisdiction over HBC if it were ever necessary to bring suit against HBC – for example, to enforce an arbitration award.

In sum, neither policy underlying Rule B is vindicated by predicating jurisdiction on a mere filing for authorization to do business under the Business Corporation Law. Accordingly, we do not consider such filing to be sufficient to make a showing that a defendant is "found" within the district. Notably, one case in this district has implicitly held as much. <u>VTT Vulcan</u>

<u>Petroleum v. Langham-Hill Petroleum, Inc.</u>, 684 F. Supp. 389, 390 (S.D.N.Y. 1988), involved a maritime attachment against a foreign corporation with offices in Virginia. The corporation had maintained an office in New York City for four years, but had closed it shortly before the attachment. <u>See</u> <u>id.</u> At the time of the attachment, the corporation's authorization to do business in New York was still in effect. <u>See</u> <u>id.</u> Applying the two-prong "found within the district" test, the court determined that while the corporation could be found for service of process, its only jurisdictional contacts were in the past, were unrelated to the subject of the litigation, and were thus insufficient to render it "found" within the district for purposes of Rule B. <u>See</u> <u>id.</u> at 391-92 (citing <u>Seawind</u>, 320 F.2d at 583). While the court did not state so directly, a necessary element of its holding was that the corporation's authorization to do business was insufficient by itself to cause it to be "found" within the district.

Accordingly, we conclude that HBC's authorization to do business does not by itself mean that HBC is "found within the district" for purposes of the maritime attachment rule. In addition, it does not make HBC's presence any more "systematic and continuous" when combined with the other contacts discussed earlier.

Conclusion

For the foregoing reasons, defendant HBC's motion to vacate the attachment is denied. The Clerk is requested to close this case.

Dated: January 11, 2006
     New York, New York

                                                  _____
                                                  GABRIEL W. GORENSTEIN
                                                  United States Magistrate Judge

Petroleum v. Langham-Hill Petroleum, Inc., 684 F. Supp. 389, 390 (S.D.N.Y. 1988), involved a maritime attachment against a foreign corporation with offices in Virginia. The corporation had maintained an office in New York City for four years, but had closed it shortly before the attachment. See id. At the time of the attachment, the corporation's authorization to do business in New York was still in effect. See id. Applying the two-prong "found within the district" test, the court determined that while the corporation could be found for service of process, its only jurisdictional contacts were in the past, were unrelated to the subject of the litigation, and were thus insufficient to render it "found" within the district for purposes of Rule B. See id. at 391-92 (citing Seawind, 320 F.2d at 583). While the court did not state so directly, a necessary element of its holding was that the corporation's authorization to do business was insufficient by itself to cause it to be "found" within the district.

Accordingly, we conclude that HBC's authorization to do business does not by itself mean that HBC is "found within the district" for purposes of the maritime attachment rule. In addition, it does not make HBC's presence any more "systematic and continuous" when combined with the other contacts discussed earlier.

Conclusion

For the foregoing reasons, defendant HBC's motion to vacate the attachment is denied. The Clerk is requested to close this case.

Dated: January 11, 2006
     New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

19